

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| E*TRADE FINANCIAL CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OMAR AMANAT, | ) |
| SHARIF AMANAT and | ) |
| DANIEL RYAN, | ) |
| | ) |
| Defendants. | ) |

No. 02 Civ. _____

**COMPLAINT FOR
DECLARATORY AND
MONETARY RELIEF**

**Jury Trial Demanded**

Plaintiff E*TRADE Financial Corporation (hereinafter, "E*TRADE"), by its undersigned attorneys, for its complaint in this action, states as follows:

### Nature of the Action

1.   This action stems from Defendants' scheme to defraud E*TRADE regarding the purported financial condition of certain entities (hereafter, the "Tradescape Entities"[1]) that Defendants induced E*TRADE to purchase in June 2002. Defendants intentionally misrepresented the revenues, assets and liabilities of the Tradescape Entities, thereby causing E*TRADE to acquire them from MarketXT Holdings Corporation, an entity that Defendants controlled, at a price exceeding their fair value. Defendants' highly orchestrated fraud included, among other things:

---

[1]   Throughout the Complaint, unless otherwise specified, reference to "Tradescape Entities" includes reference to: Tradescape Technology Holdings Inc.; Tradescape Technologies, LLC; Tradescape Momentum Holdings, Inc.; Momentum Securities, LLC ("Momentum"); Tradescape Securities, LLC; and Momentum Securities Partners, LLC.

2132368.01

- Falsifying financial statements and other information to inflate the value of the Tradescape Entities;

- Failing to disclose millions of dollars of liabilities of the Tradescape Entities;

- Inflating "revenues" through fraudulent means;

- Making numerous material misrepresentations and omissions; and

- Improperly transferring funds out of the Tradescape Entities.

2.     But Defendants' fraud did not stop when they convinced E*TRADE to acquire the Tradescape Entities.  Indeed, to bring their scheme to fruition, Defendants continued their deceptive and fraudulent conduct in the period between the execution of the Agreement and Plan of Merger By and Among E*TRADE Group, Inc., TTH Acquisition Corp., MHI Acquisition Corp., Tradescape Corp. (currently MarketXT Holdings Corp., a/k/a T Corp), Tradescape Technology Holdings, Inc. and Tradescape Momentum Holdings, Inc. dated as of April 10, 2002 (hereinafter, the "Merger Agreement") and closing of the Merger on June 3, 2002 (hereinafter, "the Closing"). During this period, Defendants generated and recorded fictitious revenues and profits in a concerted effort to hide the sharply declining securities trading volumes and related revenue of the Tradescape Entities.

3.     To create the illusion that the Tradescape Entities' business was growing instead of contracting, Defendants caused Momentum purportedly to charge customers excessive rates they did not expect customers to pay and to enter into various agreements by which affiliated parties would incur debts to the Tradescape Entities that Defendants knew full well the Tradescape Entities would be unable to collect.  In this fashion, Defendants concealed declining trading volume and revenues for the Tradescape Entities and artificially pumped up their balance sheet with false "assets" to ensure that

E*TRADE would proceed to Closing ignorant of true financial condition of the Tradescape Entities.

      4.     Even after Closing, Defendants continued to engage in fraudulent acts. Indeed, around the time of the merger, Defendant Omar Amanat fraudulently misappropriated and converted at least one check by improperly endorsing the check and depositing the funds into an account owned and controlled by certain Defendants. Moreover, certain Defendants have attempted to sell and have sold or caused to be sold restricted E*TRADE shares that they received in the sale of the Tradescape Entities in violation of the underlying Merger Agreement, other agreements executed in connection therewith and the federal securities laws.

      5.     In addition, Defendants have attempted to take advantage of an "earn-out" provision contained in the Merger Agreement by entering into undisclosed agreements to induce potential and/or existing Momentum customers to place trades with Momentum solely for the purpose of artificially inflating trading volumes, revenues and earnings. Upon information and belief, Defendants also presented, on numerous occasions, potential customers who were willing, in exchange for a share of any "earn-out" payment, to assist Defendants by placing unlawful trades for no reason other than to help Defendants reach their earn-out targets. In this manner, Defendants evidently hoped to receive up to $180 million in additional compensation from E*TRADE.

      6.     After discovering the foregoing misconduct and in an effort to avoid further escalation of the resultant disputes, E*TRADE engaged in good faith negotiations with Defendant Omar Amanat and MarketXT Holdings to arrive at a "Standstill Agreement" that was designed, in part, to repay to E*TRADE moneys it had been forced

to contribute to the business of the Tradescape Entities as a result of the liabilities that Defendants had hidden from E*TRADE. In furtherance of this fraudulent scheme, on or about September 13, 2002, Defendant Omar Amanat, on behalf of MarketXT Holdings, signed the Standstill Agreement without disclosing (as he later admitted) that he never intended to cause MarketXT Holdings to perform under that agreement. However, notwithstanding MarketXT Holdings' failure to abide by the Standstill Agreement, Omar Amanat continues to assert, on behalf of MarketXT Holdings, that the Standstill Agreement is enforceable and to use that agreement to perpetuate fraudulent acts on third parties. In reliance on Omar Amanat's promises and obligations, E*TRADE performed under the Standstill Agreement. As a consequence, upon information and belief, Defendants have procured and distributed to themselves and to others E*TRADE shares that were to be paid as part of the consideration for acquiring the Tradescape Entities.

7. As set forth herein, Defendants have engaged in numerous unlawful acts. These actions have caused and will continue to cause serious economic and other injuries to E*TRADE. E*TRADE has worked diligently to convince Defendants to acknowledge their wrong-doing and to resolve this dispute on reasonable terms. Defendants, however, made unreasonable demands and were unwilling to negotiate in good faith. Indeed, though E*TRADE performed its obligations under the various agreements, Defendants attempted to obtain moneys by threatening to file a suit against E*TRADE and various of its officers unless E*TRADE paid Defendants $1.5 billion, notwithstanding the fact that Defendants knew that their claims were meritless. When E*TRADE refused their outrageous demands, Defendants, without terminating a tolling agreement in effect

-4-

between the parties, filed that baseless suit in this Court and, consequently, E*TRADE is forced to pursue this action.

## Jurisdiction and Venue

8.      This action arises under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq*.  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 78aa.  Each Defendant resides, is found and transacts business in this District and many of the acts and transactions complained of occurred in this District.

## The Parties

### Plaintiff

10.      Plaintiff E*TRADE is a Delaware corporation with its principal place of business in New York, New York.  E*TRADE is a financial services holding company that, through various subsidiaries, provides consumers with on-line securities brokerage, banking and other related services.

### Defendants

11.      Omar Amanat is a resident of New York, New York.  During the relevant period, Omar Amanat was the Chief Executive Officer and a member of the board of directors of MarketXT Holdings and, during critical times, was the Chief Executive Officer of Momentum.  Either directly or indirectly, Omar Amanat was and is a principal stockholder of MarketXT Holdings.  During relevant times, Omar Amanat was the primary decision-maker and controlled the day-to-day operations and the policies of the Tradescape Entities.  Omar Amanat was MarketXT Holding's primary spokesperson in

-5-

the negotiations that led to the Merger Agreement, which he signed on behalf of MarketXT Holdings.

12.     Sharif Amanat is a New Jersey resident who works in New York, New York.   Sharif Amanat is Omar Amanat's father.   During the relevant period, Sharif Amanat was Chairman of MarketXT Holdings' board of directors.   Even though he was not a MarketXT Holdings executive officer, Sharif Amanat was involved in the day-to-day operations and decision-making for that company and its subsidiaries, including the Tradescape Entities.   During all relevant times, Sharif Amanat was MarketXT Holdings' single largest stockholder through his direct and indirect holdings.   The actions alleged as to Sharif Amanat took place in New York, New York.

13.     Daniel Ryan ("Ryan") is a resident of Connecticut who works in New York, New York.   During the relevant time period, Ryan was the Chief Administrative Officer and Executive Vice President of MarketXT Holdings and, at critical times, served as Momentum's Chief Financial Officer.   Ryan was involved in Momentum's day-to-day operations and controlled, in conjunction with the other Defendants, the Tradescape Entities' policies and decision-making.   He also provided E*TRADE with false financial and other information regarding Momentum in connection with E*TRADE's acquisition.   Ryan's actions took place in New York, New York.

**Related Party**

14.     MarketXT Holdings (formerly known as Tradescape.com, Tradescape Corp. and T Corp) is a privately-held Delaware corporation with its principal place of business in New York, New York.   It is a holding company that, through its subsidiaries, provides services to professional, proprietary and retail securities traders.   MarketXT

-6-

Holdings owned 100 per cent of the issued and outstanding Class A limited liability company interests of the Tradescape Entities before they were acquired by E*TRADE. MarketXT Holdings also owned 100 per cent of the stock of another subsidiary, MarketXT, Inc. ("MarketXT").

**Participation of Individual Defendants**

15.     Defendants Omar Amanat, Sharif Amanat and Ryan participated in or were aware of negotiations regarding the Merger Agreement and provided information to E*TRADE about Momentum's business. They directed, made, participated in, or were aware of misstatements and omissions to E*TRADE and knew of the materially misleading nature of these misstatements.   By reason of their stock ownership, management positions and/or board membership and their power to control the policies and decision-making at MarketXT Holdings and the Tradescape Entities, Defendants were "controlling persons" of MarketXT Holdings and the Tradescape Entities and had the power, and exercised it, to cause the Tradescape Entities to engage in the illegal practices complained of herein.

16.     By virtue of their positions at MarketXT Holdings and/or the Tradescape Entities, Defendants were involved in or aware of the day-to-day operations of these entities. They were also involved in preparing and distributing to E*TRADE information concerning the business of the Tradescape Entities knowing or recklessly disregarding the fact that such information was false and misleading, in violation of the federal securities and other laws, as described more fully herein.

**Pre-Filing Investigation**

17.     The allegations contained in this complaint are based upon the investigation of E*TRADE and its attorneys, which included:   (a) interviews of confidential witnesses, including current and former employees of the Tradescape Entities;   and (b) review and analysis of correspondence, corporate documents, the Standstill Agreement, the Merger Agreement, related agreements and schedules thereto. E*TRADE believes that further substantial evidentiary support for the allegations will be uncovered after a reasonable period for discovery.   E*TRADE further believes that there are many additional detailed facts supporting the allegations contained herein that are known only to Defendants or are within Defendants' exclusive possession and control.

**Factual Background**

**Early, Unsuccessful Attempts to Sell the Business
Drive Defendants to Launch the Fraudulent Conspiracy**

18.     Defendants first attempted to sell MarketXT Holdings to various third party investors during 1999.   At that time, Defendants solicited offers from E*TRADE, among others.   As part of its determination whether to submit a formal offer to MarketXT Holdings, E*TRADE undertook due diligence and obtained information concerning the nature of the business MarketXT Holdings was attempting to sell.

19.     Based on issues that arose concerning information that E*TRADE obtained as part of its due diligence, E*TRADE declined to purchase MarketXT Holdings.   Evidently, other potential bidders similarly declined on their own to consummate a purchase of MarketXT Holdings.

20.     In late 2001, unbeknownst to E*TRADE, the financial situation for MarketXT Holdings and its subsidiaries, including Momentum, was bleak.   Beginning in

-8-

or around April 2001, Momentum's revenues began steadily to decline. This, in turn, spawned a financial crisis at MarketXT, an affiliated corporation the operations of which were funded, at Defendant Omar Amanat's instructions, largely by transferring cash generated from Momentum's operations to MarketXT Holdings and, then, from MarketXT Holdings to MarketXT. By the fall or early winter of 2001, these entities were short on cash and had no viable source of financing, having already either lost or burned through nearly $100 million in capital provided by third parties. While Momentum's books and records reflected positive results for October 2001, Momentum experienced a steady decline in November and December. Beginning at or about that time, at least one member of MarketXT Holdings' board of directors openly discussed the looming financial crisis with his fellow board members and warned them of the perilous capital position at Momentum. Upon information and belief, with no other financing sources in sight, Defendants decided to attempt to sell MarketXT Holdings and its wholly owned subsidiaries. As cash was rapidly evaporating, Defendants were eager to consummate a transaction.

21.    Upon information and belief, Defendants recognized, after several failed attempts to sell the business (including a prior attempt involving E*TRADE), that MarketXT Holdings' poor financial performance was inhibiting them from finding a transaction partner. Meanwhile, MarketXT Holdings grew increasingly desperate for new capital at the end of 2001. As MarketXT Holdings' financial picture grew worse, Omar Amanat, with the knowledge and participation of Sharif Amanat and Ryan, hatched a new scheme: to sell the Tradescape Entities without requiring potential buyers to purchase the financially-strapped MarketXT Holdings or its other subsidiary, MarketXT.

-9-

In addition, to make the Tradescape Entities more attractive to a potential acquisition candidate, in or around December 2001 or January 2002, Omar Amanat, with Ryan's knowledge and assistance, engaged in a concerted effort to disguise the true nature of the Tradescape Entities' business and financial condition through accounting scams and manipulation.

### Omar Amanat and Ryan Falsify Financial Records and Other Information to Mislead E\*TRADE About the Tradescape Entities' Value

22.    In or around December 2001, Defendants authorized MarketXT Holdings to approach E\*TRADE regarding the possibility of a transaction whereby E\*TRADE would acquire the Tradescape Entities.  E\*TRADE again agreed to discuss a potential acquisition.  Unbeknownst to E\*TRADE at that time, or at any time prior to the Merger, the Tradescape Entities had significant liabilities and were in a steady financial decline.  Recognizing that E\*TRADE likely would lose interest in a prospective acquisition if these and other facts were known, Defendants embarked on a fraudulent course of conduct designed to conceal from E\*TRADE the Tradescape Entities' true financial condition.

23.    Beginning in early January 2002, E\*TRADE commenced a due diligence review of the Tradescape Entities, which continued to the signing of the Merger Agreement.  During and after that time, E\*TRADE requested from MarketXT Holdings, and was provided with, financial information purportedly showing the Tradescape Entities' financial performance and their assets and liabilities.  Unbeknownst to E\*TRADE, Defendants Omar Amanat and Ryan, in particular, and with the knowledge and acquiescence of Sharif Amanat, tightly controlled the information made available to E\*TRADE, thereby denying E\*TRADE access to significant and material financial and

-10-

other information.  As E*TRADE discovered after the Merger, as a result of this lack of full information and the misinformation presented to it, E*TRADE was unable, through the due diligence process, to discover the true and accurate financial condition regarding the Tradescape Entities.

24.     As the financial condition of the Tradescape Entities deteriorated, Omar Amanat and Ryan, directly and indirectly, provided E*TRADE with materially false and misleading financial statements and other information, particularly regarding Momentum. The financial statements for the fiscal year ended December 31, 2001, which purported to be audited by auditors for the Tradescape Entities, did not accrue for all liabilities at the time they were incurred.  Rather, the financial statements listed certain liabilities only when Momentum paid the expenses associated with the liabilities, as E*TRADE discovered after Closing.  Unpaid expenses simply were removed from the financial statements presented to E*TRADE.  Of course, this accounting treatment did not conform to generally accepted accounting principles ("GAAP").  Upon information and belief, Omar Amanat and Ryan misled the auditors for MarketXT Holdings with regard to Momentum's liabilities.  Omar Amanat and Ryan, apparently with the knowledge and acquiescence of Sharif Amanat, provided these misleading financial statements to E*TRADE solely for the purpose of inducing E*TRADE to rely on them in evaluating Momentum and the Tradescape Entities.

25.     For example, upon information and belief, in 2001, Omar Amanat incurred trading losses of approximately $1.2 million related to his personal trading. Rather than accept those losses personally or have them reflected as losses in Momentum's proprietary account, Omar Amanat took the money from MarketXT

-11-

Holdings and caused the expense to be amortized or deferred as costs incurred in connection with the development of new software.  MarketXT Holdings retained counsel to evaluate the propriety of those actions, but, upon information and belief, fired that counsel when the results of its inquiry did not comport with Omar Amanat's or MarketXT Holdings' interests.  Upon information and belief, MarketXT Holdings, through Omar Amanat, then retained a second law firm that provided a more favorable opinion to MarketXT Holdings.  As a result, upon information and belief, the Momentum's financial statements for the year ended December 31, 2001 failed to reflect approximately $1.2 million in trading losses and instead inaccurately characterized the expense as capital costs.

### Defendants Tightly Controlled Participation in Merger Discussions In an Effort to Control the Misinformation Provided to E*TRADE

26.    By late winter or early spring 2002, while the negotiations between E*TRADE and MarketXT Holdings were continuing, the financial condition of the Tradescape Entities continued to deteriorate.  Momentum, in particular, had been a vital source of operating revenue for MarketXT Holdings and its affiliate, MarketXT, and Momentum's slide threatened its continued existence.  Upon information and belief, Defendants determined to ensure that E*TRADE did not discover the continuing erosion of Momentum's business or the nature of the obligations they had forced Momentum to carry in order to continue the businesses of MarketXT Holdings and MarketXT.  Thus, for example, Defendants refused to provide E*TRADE with any financial information about MarketXT Holdings or MarketXT because, on information and belief, those financial records would have revealed that Momentum was responsible for various debts on MarketXT Holdings' books and that, as a result, the Momentum assets that MarketXT

-12-

Holdings was selling were significantly overvalued.

27.    To further the scheme, Defendants were careful to control the flow of information to E*TRADE.  Upon information and belief, beginning in January 2002, Omar Amanat and Ryan effectively seized the operational responsibilities away from the officers of Momentum.  At that time, Omar Amanat began to exercise increased control over the operations of Momentum and to perform managerial functions he had not previously performed.  In addition, at Omar Amanat's urging, Ryan began to control and to direct the accounting functions and operations at Momentum.  To solidify his and Ryan's control over Momentum, at a February 19, 2002 MarketXT Holdings board of directors meeting, Omar Amanat proposed that the board appoint a "sole point of contact" between MarketXT Holdings and acquisition candidates, including E*TRADE.  MarketXT Holdings' board, including Omar Amanat and Sharif Amanat and persons under their direction and control, approved a resolution appointing Omar Amanat and MarketXT Holdings' investment banker as exclusive points of contact for these merger discussions.  By attempting to control the flow of information in this manner, Defendants were able to ensure that E*TRADE was deprived of complete and accurate information regarding Momentum and the Tradescape Entities.

28.    At the same meeting, MarketXT Holdings' board, including Omar and Sharif Amanat, also approved a resolution appointing Omar Amanat and Ryan as Momentum executive officers.  Thus, Ryan, acting in concert with Omar Amanat, solidified his control over Momentum's books and records as well as its expenditures.

29.    In the ensuing weeks, E*TRADE continued discussions with MarketXT Holdings representatives, most often Omar Amanat, concerning the potential acquisition

of the Tradescape Entities. In connection with these discussions, MarketXT Holdings, Omar Amanat and Ryan continued to provide false and misleading financial information to E*TRADE concerning the Tradescape Entities, as described in more detail below.

**Defendants Inflate Momentum's Revenues Through Fraudulent Means**

30.     Beginning in or around late January or February, 2002, Omar Amanat and Ryan prepared fictitious summaries of Momentum's monthly revenue and production figures. First, Ryan caused MarketXT Holdings to change the method it had previously used to record revenues from a trade date basis to a calendar basis. This not only had the effect of adding several "revenue-producing" days to the month of January 2002 that would not have been included under Momentum's traditional way of reflecting revenues but also caused Momentum's January 2002 revenues to be overstated. Second, Omar Amanat and Ryan took Momentum's actual January 2002 financial results and arbitrarily modified them to reflect inflated and exaggerated revenue figures. A senior Momentum official discovered these overstatements and objected to Ryan's providing those misleading numbers to E*TRADE. Nevertheless, Ryan, with Omar Amanat's knowledge and concurrence, provided these documents to E*TRADE in or about February 2002, knowing that the figures included in them were artificially inflated.

31.     In late January or early February 2002, Omar Amanat and Ryan caused Momentum to charge unlawfully high commissions to customers and to record these overcharges as "revenue," with full knowledge or in reckless disregard of the fact that the customers would not pay the overcharges. In particular, Omar Amanat and Ryan directed that Momentum charge two customers commissions far in excess of those that had been agreed to, resulting in overcharges of $900,000 for the month of January.

Notwithstanding the fact that these overcharges were not actually owed by the customers, Omar Amanat and Ryan caused these overcharges to be included as "revenue" on the monthly summaries that were provided to E*TRADE. Those overcharges constituted roughly 30% of Momentum's revenue for the month. Once the trades settled, however, Momentum's customers discovered the overcharges and demanded that they be corrected. By then, however, MarketXT Holdings had provided E*TRADE with Momentum's inflated monthly revenues, including fictitious "revenue" from these intentional and improper commission overcharges. E*TRADE, in reliance on the information it received, was thereby induced to believe that Momentum's revenues were materially higher than they actually were. Omar Amanat and Ryan knew and intended that E*TRADE would rely on this materially misstated information.

32.     Having falsely portrayed Momentum's financial performance for January 2002, Omar Amanat and Ryan repeated their deceptive presentation of results for the month of February 2002. On or around April 7, 2002—three days prior to the execution of the Merger Agreement—Ryan wrote to Omar Amanat that, as they had for January, they could adjust the fees Momentum was charging (even though it knew its customers would not pay those fees) to show increased revenues. He cavalierly asked Omar Amanat: "*How much revenue do you want to show?*" By arbitrarily—and fraudulently—recording fees in this way, Omar Amanat and Ryan knew that the February results they provided to E*TRADE overstated Momentum's actual performance and would induce E*TRADE to believe that Momentum was performing far better than it actually was.

33.     Defendants provided this fraudulent information with the knowledge and intention that E*TRADE would be defrauded thereby and with the fraudulent intention to

induce E*TRADE into believing that Momentum was in better financial condition than it actually was.   Ultimately, Defendants intended to induce E*TRADE to acquire the Tradescape Entities on terms far more favorable to Defendants than were warranted by the actual financial condition of the Tradescape Entities.

34.   In addition, Defendants failed to disclose to E*TRADE that Momentum had limited cash that was insufficient to make payments it promised to its trader groups and other creditors.   In or around January 2002, Ryan issued a directive to personnel of the Tradescape Entities that no disbursements over a certain amount were to be made without his prior approval.   From that point forward, Ryan controlled expenditures, picking and choosing which creditors he would pay based upon their relative importance in allowing cash-strapped Momentum and the Tradescape Entities to continue in business.   As a result, Ryan caused the Tradescape Entities to default on amounts due to various creditors, but did not disclose those defaults to E*TRADE.

35.   In January 2002, Ryan also directed that cash-strapped Momentum upstream $800,000 in funds to MarketXT Holdings so it would have funds to discharge certain of its and its affiliates' debts.   Momentum's Controller objected strenuously, advising Ryan and others that the transfer would imperil Momentum's cash and net capital positions.   Nevertheless, Ryan directed that the funds be transferred, and they were.   The Controller resigned in protest, but not before memorializing his concerns in a letter to Ryan and others.   E*TRADE did not learn of this letter (or these practices) until after the transaction had closed.

**Defendants Failed to Disclose to E*TRADE Numerous Known Liabilities of the Tradescape Entities**

36.     As part of Defendants' fraudulent scheme, unbeknownst to E*TRADE, Omar Amanat and Ryan not only provided misleading financial information between January and April 2002, but also omitted to disclose millions of dollars in liabilities that the Tradescape Entities owed. These amounts included, in large part, overdue bills to vendors and others that MarketXT Holdings stopped paying in anticipation of the sale of the Tradescape Entities with the intention that, following the transaction, all amounts due and owing would be the responsibility of the successor owner, E*TRADE.

37.     For example, MarketXT Holdings, at Omar Amanat's urging, failed to disclose to E*TRADE various unpaid legal bills that owed by the Tradescape Entities. Indeed, following Closing, several law firms demanded payment from E*TRADE for overdue invoices exceeding $1 million.

38.     MarketXT Holdings also concealed arrangements with several Momentum customers that resulted in significant liabilities for Momentum and severely threatened its ability to meet its net capital requirements.

39.     Unbeknownst to E*TRADE, Omar Amanat had made secret, undisclosed oral arrangements with various customers who, individually or as part of "trader groups," traded through Momentum, to "rebate" to them part of the consideration they paid for using Momentum's services.   To conceal these arrangements—while inflating Momentum's books and records—Omar Amanat caused Momentum to reflect the full commissions "charged" to trader groups (*i.e.*, without giving effect to the rebates) as revenue on its books and records, but not to reflect the corresponding liability for the rebate that Momentum owed to the trader groups. By including this revenue without the offsetting liabilities in financial information provided to E*TRADE, Omar Amana and

-17-

MarketXT Holdings materially overstated Momentum's revenues and understated its liabilities. In effect, MarketXT Holdings maintained two sets of books and records—one for themselves and another misleading set it provided to E*TRADE.

40. Omar Amanat left E*TRADE holding the bag in other respects. Several trader groups have approached E*TRADE since Closing demanding payment millions of dollars in unpaid rebates promised by Omar Amanat. After investigating these claims, E*TRADE learned that Omar Amanat had made oral agreements with various trader groups that he caused not to be reflected on Momentum's books. Indeed, E*TRADE has been forced to pay out millions of dollars to settle claims of non-payment of rebates and other compensation that Omar Amanat promised the traders but failed to disclose to E*TRADE. Other substantial claims against E*TRADE entities, as successor to Momentum, remain unresolved, even today, and thus the full extent of E*TRADE's damages is still not known.

41. Omar Amanat made further undisclosed oral and written agreements with trader groups to "discount" fees and commissions that Momentum charged them. Again, however, Momentum failed to record these discounts on its books and records, thus artificially inflating Momentum's supposed assets and saddling E*TRADE with additional undisclosed liabilities. Indeed, after investigating the facts, E*TRADE has been forced to pay millions to settle such claims by trader groups. As a result, of these undisclosed debts, the liabilities that Momentum disclosed to E*TRADE were materially understated.

42. MarketXT Holdings further concealed Momentum's liabilities by failing to disclose certain liabilities related to bonus commitments that Omar Amanat made on

-18-

behalf of Momentum.  In 2001, MarketXT Holdings committed Momentum to pay certain employees a bonus for the calendar year in two equal installments.  The first payment was made in 2001, but MarketXT Holdings deferred the second payment until 2002.  Nevertheless, MarketXT Holdings failed to record that liability on Momentum's financial records and did not disclose this liability to E*TRADE.  By intentionally hiding this liability, Defendants concealed the existence of several hundred thousand dollars in additional liabilities owed by Momentum.

43.     Early drafts of the various schedules to the Merger Agreement that were prepared to disclose claims, liabilities and contingent liabilities to E*TRADE in connection with the merger were circulated to various MarketXT Holdings and Momentum personnel for comment.  On several occasions, one of Momentum's officers added certain items to the schedules provided to him in draft form and returned the revised schedule to Omar Amanat and Ryan.  Rather than disclose those items in the schedules, however, Amanat, Ryan or others acting at their direction deleted such items with the intent of preventing E*TRADE from discovering the existence of known liabilities and contingent liabilities.

44.     Following its acquisition of Momentum, E*TRADE has discovered that vendors with whom Momentum conducted business prior to the Merger claim to be owed funds under various arrangements with Momentum.  Defendants knowingly or recklessly failed to disclose these liabilities to E*TRADE.  Consequently, as Defendants planned, E*TRADE has been forced to pay these outstanding debts out of its own funds and continues to do so, to its detriment.

**Defendants Purport to "Forgive" a $5 Million
Receivable From Market XT to Momentum**

45.   Between January and May 2002, MarketXT incurred a $5 million debt payable to Momentum.  This debt arose as a result of transactions that Momentum routed through MarketXT pursuant to an arrangement whereby MarketXT agreed to pay, or rebate to, Momentum $4 for every 1,000 shares in transactions initiated by Momentum or its customers.  The receivable thus created was carried on Momentum's books as an asset.

46.   Originally, the amount MarketXT was to pay Momentum was lower than $4 for every 1,000 shares.  Even so, a senior official at MarketXT objected to the rate as being unreasonably high, and he and others expressed skepticism about MarketXT's ability to pay Momentum at that rate.  Nevertheless, upon information and belief, Ryan, with Omar Amanat's knowledge, increased the rate to $4 per 1,000 shares in an effort to inflate the revenues Momentum would supposedly receive through this activity.

47.   At or around that time, Omar Amanat directed that MarketXT charge market participants on the other side of those transactions an "access" fee for using MarketXT's trading system.  In theory, these "access" fees were to be the source of the $4 per 1,000 share rebate MarketXT was obliged to make to Momentum.  A senior MarketXT official expressed to Omar Amanat and others strong skepticism at MarketXT's ability to collect access fees of this magnitude.  Omar Amanat and Ryan knew or were reckless in not knowing at the time these arrangements were made or shortly thereafter that the market participants would not pay any such "access" or other fees and thus that MarketXT would not be able to use those funds as a source to rebate

funds owed to Momentum.  They soon discovered that the market participants would not pay the rates they sought to impose.

48.     Nevertheless, at or around the same time, Omar Amanat caused Momentum to agree that it would remit to customers who initiated trades through it over MarketXT a payment (usually $3.30 per 1,000 shares).  Momentum was responsible for those payments whether or not it received the payments Market XT had agreed to make for routing transactions over MarketXT.

49.     Although Momentum continued to show the receivable for these access fees due from MarketXT as an asset, as Omar Amanat and Ryan knew, Momentum did not accrue corresponding liabilities arising out of its obligation to rebate funds to its customers under the arrangements described in the preceding paragraph.  These liabilities were readily determinable from the trading data and information that Momentum and MarketXT received in the ordinary course of their business.  Consequently, from approximately February through May 2002, Momentum's books and records materially understated its liabilities by not recording the amounts due to customers for the foregoing rebate trading.  Additionally, upon information and belief, some or all of the FOCUS reports that Momentum filed with the National Association of Securities Dealers ("NASD") during this period were false and misleading in that they did not reflect all outstanding liabilities.  Eventually, as described below, the Defendants sought to transfer that receivable off the books of Momentum.

### The Fraud Continues with False Representations
### and Warranties in the Merger Agreements

50.     As a result of their fraudulent conduct and material misrepresentations and omissions, Defendants induced E*TRADE to sign the Merger Agreement on April 10, 2002.  Under the Merger Agreement, E*TRADE agreed, subject to the satisfaction of certain conditions and the continuing validity of certain representations and warranties, to remit to MarketXT Holdings 11,750,052 shares of restricted E*TRADE stock in connection with the Merger.  The Merger Agreement also provided that MarketXT Holdings could receive up to an additional $180 million in E*TRADE stock, if Momentum's revenues hit certain target levels between July 1, 2002 and December 31, 2002, and during calendar 2003, respectively (the "Earn-out").

51.     The stock to be issued by E*TRADE in connection with the Merger was the subject of other agreements.  The bulk of the E*TRADE shares (9,400,042 shares) were issued to MarketXT Holdings subject to an Orderly Distribution and Lockup Agreement dated as of May 31, 2002 (the "Lock-Up Agreement").   The Lockup Agreement precluded MarketXT Holdings from selling or otherwise encumbering the E*TRADE stock except in accordance with a schedule set forth in the agreement, as discussed in more detail below.  The remaining 2,350,010 E*TRADE shares were held in escrow in accordance with the May 31, 2002 Escrow Agreement to satisfy claims by E*TRADE for MarketXT Holdings' violations of the Merger Agreement.

52.     The parties made certain representations and warranties in the Merger Agreement and related documents.  The representations and warranties that Defendants made on MarketXT Holdings' behalf related to, among other things, the nature of the Tradescape Entities' business and financial condition.

53.   Defendants were aware of and/or participated in, and are responsible for, MarketXT Holdings' representations and warranties contained in the Merger Agreement and related documents.   Omar Amanat was the primary spokesperson for MarketXT Holdings and was involved directly in the negotiation of the Merger Agreement and, with the knowledge and consent of the other Defendants, signed the Merger Agreement and related documents on MarketXT Holdings' behalf.   Sharif Amanat attended board and other meetings where these representations were discussed and otherwise knew the nature of MarketXT Holdings' representations.   And Ryan, who created and provided E*TRADE with documents that deliberately misstated the financial condition of the Tradescape Entities and their operating results, also participated in Merger discussions and was aware of the nature of MarketXT Holdings' representations.

54.   Defendants knew or recklessly disregarded the fact that MarketXT Holdings' representations and warranties overstated the value of the Tradescape Entities. Instead of disclosing the true facts at this time, Omar Amanat, in furtherance of his and his cohorts' fraudulent scheme, signed the Merger Agreement in an effort to continue to foster false impressions concerning Momentum's business and value.   In so doing, Omar Amanat, acting for himself and the other Defendants, intentionally or recklessly made misstatements of material fact and omitted to state material facts to induce E*TRADE to agree to the terms contained in the Merger Agreement.

55.   For example, with respect to the Momentum financial statements that MarketXT Holdings provided to E*TRADE, MarketXT Holdings, through Omar Amanat, falsely represented and warranted, *inter alia*, that such financial statements:

> a.   "were prepared in accordance with GAAP applied on a basis consistent with that of preceding accounting periods"; and

      b.  "fairly present in all material respects the financial condition of [the relevant Tradescape Entity] represented in such statements."

56.    As described above, Omar Amanat and Ryan knew or were reckless in not knowing that those financial statements were materially false and misleading in that Defendants had caused Momentum to record revenues it would never collect, to book assets that were impaired and overvalued and not to reflect liabilities that Momentum and the Tradescape Entities owed.  Omar Amanat and Ryan also knew that the financial statements MarketXT Holdings provided to E*TRADE were false because Defendants improperly had transferred liabilities to other entities, including MarketXT Holdings, that should have been reflected on the financial records.  Thus, contrary to the representations in the Merger Agreement, the financial statements neither complied with GAAP nor fairly represented the Tradescape Entities' financial condition or their true value.

57.    With respect to the Tradescape Entities' operations after December 31, 2001, MarketXT Holdings, through Omar Amanat and others, generally represented that they have "conducted their respective businesses in the ordinary course consistent with past practice."  More specifically, MarketXT Holdings represented that "there has not occurred" any of the following:

      a.  An "acquisition, sale or transfer of any asset or property of [the Tradescape Entities] . . . , other than in the ordinary course of business and consistent with past practice . . .";

      b.  An "impairment, damage, destruction, loss or claim not covered by insurance";

      c.  A "change in accounting methods or practices (including any change in depreciation or amortization policies or rates)";

      d.  A "contract entered into by [the Tradescape Entities], other than in the ordinary course of business"; or

e. An "increase in or modification of the compensation or benefits payable or to become payable by [the Tradescape Entities] to any of [their] respective directors, officers or employees, other than (in the case of non-executive officer employees) in the ordinary course of business consistent with past practice."

58.    These statements were materially false and misleading in that, among other reasons, Omar Amanat and Ryan transferred assets and liabilities and entered into multiple undisclosed contracts with third parties and others outside the normal course of business, as described above.  Beginning in or around January 2002, Omar Amanat and Ryan had also changed the way in which they prepared financial records reflecting the Tradescape Entities' revenues to create the false impression that its revenues were increasing when they clearly were not.  All of these actions distorted the Tradescape Entities'  results of operations and created liabilities for the Tradescape Entities that Defendants improperly failed to disclose to E*TRADE.

59.    With respect to liabilities and claims against the Tradescape Entities, MarketXT Holdings, through Omar Amanat, warranted that:

> There are no Liabilities against, relating to or affecting [the Tradescape Entities] or any of [their] respective assets and properties other than (i) those reflected or reserved against on the Audited Financial Statements, or (ii) those incurred in the ordinary course of business consistent with past practice since the date of the last balance sheets for [the Tradescape Entities] included in the Audited Financial Statements and which have not had nor could be reasonably expected to have a Material Adverse Effect on [the Tradescape Entities] . . . .

60.    These statements were materially false and misleading in that the Tradescape Entities had numerous liabilities that were not reflected on their financial statements and/or were not incurred in the normal course of business.  These included, but were not limited to, millions of dollars owed to third parties as a result of agreements

-25-

entered into by Omar Amanat, with the knowledge of the other Defendants, and millions of dollars of unpaid bills to vendors and others that Omar Amanat and Ryan improperly omitted from the Tradescape Entities' books and records. These undisclosed liabilities could, and did, impair E*TRADE's ability to assess the business' value in advance of the Merger.

61.     Concerning claims by third parties and governmental entities, MarketXT Holdings, through Omar Amanat, represented that, except as specifically disclosed elsewhere:

> there are no private or governmental actions, suits, proceedings, arbitrations, claims, inquiries, examinations, inspections or investigations pending by or before any Governmental Entity, agency, SRO, court or tribunal, foreign or domestic or, to the knowledge of [Defendants], threatened against [the Tradescape Entities] or any of their respective officers or directors (in their capacities as such).

62.     This statement was materially false and misleading in that several third parties had pressed claims and were threatening to sue MarketXT Holdings, the Tradescape Entities, and Omar Amanat with respect to their failure to honor commitments under the undisclosed rebate and commission agreements discussed above. In addition, several vendors had made claims against the Tradescape Entities that MarketXT Holdings did not disclose to E*TRADE.

63.     MarketXT Holdings also represented that the Tradescape Entities were authorized to continue to operate and were in compliance with applicable regulatory requirements. Specifically, MarketXT Holdings, through Omar Amanat, represented that:

> a.   except as specifically disclosed elsewhere, "[the Tradescape Entities have] complied in all material respects with all applicable Laws and

-26-

Regulations, and is not in violation in any material respect of, and has not received any notices of violation with respect to, any Laws and Regulations in connection with the conduct of its business or the ownership or operation of its business, assets and properties"; and

b. "[Defendants were not] aware of any facts and circumstances that would . . . cause the NASD or any federal or state regulatory agency or other Governmental Entity or SRO to revoke or restrict [the Tradescape Entities'] Authorizations to operate as a broker-dealer after the change in ownership and control [pursuant to the Merger Agreement]."

64.     These statements were materially false and misleading in that Defendants, through their actions, as described above, violated, in addition to other laws and regulations, state and federal securities laws and state common law in connection with the conduct and operation of its "business, assets and properties." Moreover, beginning in or around February 2002, by failing to reflect the assets of the Tradescape Entities at realizable value or the true magnitude of its liabilities, Defendants caused Momentum to file at least one false and misleading FOCUS report with the NASD, in contravention of applicable regulatory requirements.

65.     Defendants' misconduct in this regard, particularly their fraudulent accounting practices, exposed Momentum to the undisclosed risk that state and federal regulatory agencies and self-regulatory organizations could revoke or restrict Momentum's authorization to operate as a broker-dealer following the Merger. In fact, following Closing, as a result of Defendants' conduct, Momentum was unable to file a required report with regulators regarding its compliance with federal net capital requirements. Subsequently, E*TRADE was forced to file a report reflecting a net capital deficiency by Momentum.

-27-

66.   MarketXT Holdings, through Omar Amanat, also represented that it was selling a "going-concern" that could continue operating as it had historically. Specifically, MarketXT Holdings warranted that Momentum's assets "are sufficient to enable [E*TRADE] to operate [Momentum's] business immediately after Closing as [it is] being operated on the date of this [Merger Agreement]." MarketXT Holdings also represented to E*TRADE that, at Closing, Momentum would have at least $750,000 in excess net capital.

67.   These representations were materially false and misleading in that Defendants were aware that Momentum had critical net capital deficiencies that were further exacerbated by millions of dollars in undisclosed and overdue liabilities to, among others, vendors, trader groups, and employees.

68.   Finally, MarketXT Holdings, through Omar Amanat, gave E*TRADE assurances that each and every one of the foregoing representations was truthful, accurate and complete. It promised that:

> None of the representations or warranties made by [Defendants] herein or in any schedule hereto . . . contains or will contain at the Effective Time any untrue statement of a material fact, or omits or will omit . . . to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading in any material respect.

69.   In reality, the representations and warranties MarketXT Holdings made by having Omar Amanat sign the Merger Agreement were untrue for the reasons stated above.

70.   In having Omar Amanat sign the Merger Agreement on MarketXT Holdings' behalf, Defendants promised that, between execution of the Merger Agreement and the Closing, they would operate the Tradescape Entities as they had been operated

historically.  Specifically, MarketXT Holdings, through Omar Amanat, agreed that it would "carry on [the Tradescape Entities' business] only in, and not to take any action except in, the ordinary course in substantially the same manner as heretofore conducted." Specifically, MarketXT Holdings, through Omar Amanat, agreed to:

    a.  "use commercially reasonable efforts to preserve [the Tradescape Entities'] relationships with customers, suppliers, distributors, licensors, licensees, and others having business dealings with [the Tradescape Entities]"

    b.  "maintain [the Tradescape Entities'] assets and properties in good working order and condition . . ." and

    c.  "comply in all material respects with Laws and Regulations, self-regulatory law, ordinance, rule or regulation applicable to the conduct of [the] business . . to the end that [the Tradescape Entities'] goodwill and ongoing businesses shall be unimpaired [at Closing]."

71.    These statements too were materially false and misleading in that, upon information and belief, at the time they made these representations, Defendants never intended to honor them.  To the contrary, upon information and belief, Defendants intended to ignore the Tradescape Entities' agreements with customers, suppliers, and vendors with the intention that any unsatisfied (and undisclosed) liabilities would have to be borne by E*TRADE after the Merger.  In addition, Defendants knew or recklessly disregarded that their failure to honor these obligations would not only impair the Tradescape Entities' assets but would also give rise to violations of laws and regulations that could adversely affect Momentum's ability to continue to operate as a registered broker-dealer.

72.    Moreover, Defendants caused MarketXT Holdings to agree not to take any action that would cause any of the foregoing representations and warranties it made to be untrue as of the Merger.  As the Merger Agreement provides:

[MarketXT Holdings will not] take any action or engage in any practice or enter into any transaction which would cause any representation or warranty contained in this Agreement with respect to [the Tradescape Entities] to be untrue in any material respect (if not qualified by materiality) or in any respect (if qualified by materiality) or result in a breach in any material respect (if not qualified by materiality) or in any respect (if qualified by materiality) of any covenant made by or on behalf of [the Tradescape Entities].

73.  These statements were materially false and misleading at the time in that Defendants, among other things, intended to, and did, take numerous actions that rendered the representations in the Merger Agreement false and that would result in breaches of the Merger Agreement.  Upon information and belief, at the time MarketXT Holdings made that representation, Defendants intended, after signing the Merger Agreement to continue to:

    a.  impair the Tradescape Entities' assets in advance of the Merger and thereinafter;

    b.  create additional liabilities that they would not disclose to E*TRADE in advance of the Merger, or at any time;

    c.  engage in fraudulent accounting practices to perpetuate the artificial inflation of financial information concerning the Tradescape Entities in advance of the Merger Closing;

    d.  violate the federal securities law, state common law, and other laws and regulations with respect to the Tradescape Entities; and

    e.  secure ongoing employment with E*TRADE so as to enable Defendants to continue pilfering assets of the Tradescape Entities.

74.  Defendants knew that these statements were false and misleading when made and intended such statements to defraud and mislead E*TRADE in connection with the Merger.  In particular, Defendants intended to deceive E*TRADE as to the true value of the Tradescape Entities.  Defendants' knowledge derived from their personal direction and participation in the actions that rendered the statements false.  Alternatively, to the

extent that they themselves did not personally direct or undertake the actions that rendered the statements false, Defendants knew about them because they regularly participated in board meetings and other discussions at which these matters were discussed. Defendants were also involved in the determination to control the flow of information to E*TRADE to ensure that correct and material information was withheld from E*TRADE in connection with the Merger. For these reasons, to the extent that the Defendants were not actually aware of these matters, they were reckless in not knowing about them.

75.     E*TRADE was not aware at that time, nor did it discover until well after the Closing, that Defendants, and Omar Amanat and Ryan in particular, had created fraudulent financial schedules and other financial information to submit to E*TRADE. Nor was E*TRADE aware that Defendants had manufactured false accounting entries on the books and records of the Tradescape Entities to create the erroneous impression that the Tradescape Entities were financially sound and profitable. Nor had Defendants disclosed to E*TRADE the Tradescape entities' numerous undisclosed liabilities.

**Defendants Continue Their Fraudulent Scheme Prior to Closing**

76.     Defendants recognized that E*TRADE would seek more information about the Tradescape Entities after execution of the Merger Agreement but before Closing. Indeed, the Merger Agreement afforded E*TRADE the right to terminate the Merger Agreement upon notice for, *inter alia*, a material adverse change in the Tradescape Entities' business or breach of the representations and warranties discussed above. Accordingly, the success of Defendants' scheme depended, in part, on their

ability to continue misleading E*TRADE about the Tradescape Entities' true condition in the months prior to Closing. Defendants did so in several ways, as described below.

77.     Defendants caused MarketXT Holdings to provide E*TRADE with FOCUS reports for Momentum for March and April 2002 that purported to show excess net capital of at least $1 million. Those reports, as Omar Amanat and Ryan knew or recklessly disregarded, were false and misleading in that they overstated the Tradescape Entities revenues and assets and understated their liabilities. Indeed, in the weeks leading to Closing, the Tradescape Entities' financial condition continued to deteriorate, but Defendants concealed the Tradescape Entities' true financial condition from E*TRADE to mask their declining value.

78.     Apart from furthering their fraudulent scheme to induce E*TRADE to consummate the Merger, Defendants' actions constituted a knowing and purposeful material breach of the representations and warranties contained in the Merger Agreement described above.

79.     On or about May 29, 2002, Ryan, at Omar Amanat's direction, ordered a Momentum employee to make an unlawful inter-company journal entry that would have "upstreamed" the $5 million receivable from Momentum to MarketXT Holdings described above. However, E*TRADE learned of MarketXT Holdings' attempt to transfer this receivable from Momentum to MarketXT Holdings, which would have impaired Momentum's ability to receive payment on the $5 million receivable, and, accordingly, the transfer was not completed.

80.     The attempt to "upstream" this $5 million receivable was improper and unlawful. Because Momentum had a net capital deficiency as of May 2002, it could not

upstream capital without violating Exchange Act Rule 15c3-1.  On information and belief, Momentum undertook earlier capital withdrawals while net capital deficient, in violation of Exchange Act Rule 15c3-1.  Moreover, the transfer would have stripped from Momentum a valuable asset, to which MarketXT Holdings had no legal entitlement and for which it provided no consideration whatsoever.  In addition, the transfer would have violated the Merger Agreement, since it was not in the "ordinary course" of Momentum's business.

81.   Defendants were not to be deterred, however.  E*TRADE discovered after the Closing that, on or about June 3, 2002, Omar Amanat and Ryan, acting for MarketXT and Momentum, executed an agreement that purported to forgive the $5 million receivable due Momentum from MarketXT.  This unlawful "debt forgiveness" was not disclosed to E*TRADE and was intended to strip from Momentum and E*TRADE an asset that was to remain a Momentum asset following the Closing.  To date, MarketXT has failed to pay the $5 million receivable, which has increased substantially due to subsequent trading activity.

82.   Between execution of the Merger Agreement in April 2002 and the Closing in June, E*TRADE discovered a series of undisclosed liabilities and legal claims.  By letter dated April 26, 2002, E*TRADE outlined these undisclosed issues, which were or should have been known to MarketXT Holdings and its representatives before executing the Merger Agreement, but which had not been disclosed to E*TRADE.  In response, MarketXT Holdings explained that it "forgot" about some of those issues or that senior management had not known of them prior to signing the Merger Agreement.  On information and belief, these statements were false and known to be false when made.

-33-

83.     At E*TRADE's insistence, MarketXT Holdings supplemented the liability schedules and other information in an Amendment to the Plan of Merger, dated May 30, 2002.  At that time, Defendants assured E*TRADE that they had cured all material omissions in the schedules and that they had provided all material information to E*TRADE.  E*TRADE relied upon Defendants' representations and proceeded towards Closing.

84.     Defendants' representations were untrue, however, as E*TRADE learned after the Closing.  Contrary to their representations, Defendants were aware of other material omissions and continued to actively conceal them.

85.     Before Closing, for example, Defendants concealed in excess of $1.2 million in debt that Momentum owed to The Nasdaq Stock Market, Inc. ("Nasdaq").  Moreover, they failed to disclose to E*TRADE that, before Closing, the Nasdaq had threatened to eliminate Momentum's access to Nasdaq's services if the liability was not satisfied promptly.  To conceal this liability, at some point in April 2002, Omar Amanat and Ryan ordered that this liability be moved off the books of Momentum and "transferred" to MarketXT Holdings.  The Nasdaq, however, did not agree to MarketXT Holdings' assumption of this liability and, accordingly, Momentum remained fully liable for the debt.  At or around the time of the Closing, the Nasdaq demanded payment of the entire debt.  Although E*TRADE forced MarketXT Holdings to make the payment due to Nasdaq, the Defendants' actions in transferring the liability to MarketXT Holdings caused Momentum's books and records and its FOCUS reports for the period of approximately February through May, 2002 to be false and misleading in that they did not accurately reflect the liability Momentum owed to Nasdaq.

86.   Defendants also failed to disclose purported commitments made to numerous employees of the Tradescape Entities before Closing.   The commitments represented additional potential liabilities for the Tradescape Entities, which would accrue subsequent to the Merger.   For example, upon information and belief, Omar Amanat promised employees a percentage of funds received in connection with the anticipated Earn-out under the Merger Agreement.   Though Omar Amanat led these employees to believe that the Earn-out commitment would remain the liability of the Tradescape Entities after Closing, and therefore the ultimate responsibility of E*TRADE, MarketXT Holdings never disclosed this potential liability to E*TRADE.

87.   In addition, MarketXT Holdings and Omar Amanat have converted funds from E*TRADE to their own use.   For example, on or about May 1, 2002, Tradescape Technology, a Tradescape Entity to be acquired by E*TRADE, received check number 22108, payable for $164,269.96.   Unbeknownst to E*TRADE, Omar Amanat unlawfully converted this check and, on information and belief, deposited it into an account he owned and controlled so that he, and not E*TRADE, would benefit from the funds.

88.   Closing initially was scheduled for May 29, 2002.   At or around that time, as a condition to Closing, E*TRADE insisted that all employees of the Tradescape Entities resign so that E*TRADE, at its option, could rehire various individuals to work as employees of the successor company.   When one employee refused, citing his concern that resignation would terminate his alleged right to a severance agreement, E*TRADE learned for the first time that at least five employees claimed they had been granted employment agreements with one or more of the Tradescape Entities by Omar Amanat.

None of these agreements had been disclosed to or authorized by E*TRADE and were in addition to Omar Amanat's promises of deferred compensation.

89.     Omar Amanat acknowledged the existence of those agreements, but falsely claimed that Defendants were not obligated to disclose them because they involved MarketXT Holdings, rather than a Tradescape Entity. The severance pay promised under these agreements totaled approximately $1.5 million. Through negotiations, E*TRADE was able to secure a release from these agreements and MarketXT Holdings assumed the liability. E*TRADE also sought and obtained further representations that no other undisclosed employment agreements involving the Tradescape Entities existed. Omar Amanat personally represented that there were no other agreements. Upon information and belief, that representation was false when made because Omar Amanat knew that he had entered into oral employment agreements with other employees on behalf of the Tradescape Entities before the Merger.

90.     Omar Amanat, on MarketXT Holdings' behalf, promised that, at Closing, Momentum would have $750,000 in excess net capital. In reliance on that promise, E*TRADE proceeded with the Closing. Upon information and belief, Defendants never intended to cause Momentum to have excess net capital as promised. Once the Merger closed, E*TRADE discovered that MarketXT Holdings did not honor its commitment to ensure that Momentum had $750,000 in excess net capital. Instead, having simply lied to E*TRADE to induce the Merger, Defendants systematically siphoned off cash and other assets from Momentum, as set forth herein, further devaluing Momentum and risking its ability to continue in business.

91.    At Closing, Defendants failed to disclose to E*TRADE any of the acts, practices and courses of business described above and, by failing to do so, reaffirmed the correctness of the representations and warranties they had previously made in the Merger Agreement.  E*TRADE continued to rely on those representations and warranties, as well as other disclosures Defendants had made, and consummated the Merger.  E*TRADE fulfilled all of its promises and agreements under the Merger Agreement and remitted the consideration called for thereunder.

### Defendants' Misstatements and Omissions Forced E*TRADE to Infuse Millions of Dollars into the Tradescape Entities to Maintain Their Viability

92.    As a result of Defendants' misrepresentations and omissions, and their agreement to ensure that Momentum maintained at least $750,000 in excess net capital following Closing, E*TRADE consummated the Merger on the terms set forth in the Merger Agreement.  Had E*TRADE known the true facts that Defendants concealed, E*TRADE would have insisted that the consideration it paid in the Merger be reduced to reflect the true value of the Tradescape Entities.  Indeed, business conducted by Momentum's successor since the Closing indicates that, because of the Defendants' fraudulent representations, E*TRADE has already remitted to Defendants consideration far in excess of the underlying value of Momentum, to E*TRADE's economic detriment.  Because the full extent of the Defendants' fraudulent activities is not yet known, E*TRADE cannot fully quantify its damages, but will do so prior to trial

93.    After the Closing, E*TRADE began to discover that many of the representations and promises that Defendants made and subsequently reaffirmed were not true and that Defendants failed to honor many of the undertakings and commitments made in the Merger Agreement.  Having completed the Merger, E*TRADE continues to

-37-

suffer economic harm.  To continue Momentum's business, E*TRADE has been forced to infuse large amounts of capital to repay Momentum's undisclosed commitments and to ensure compliance with regulatory net capital requirements.

94.     Specifically, E*TRADE was forced to contribute approximately $1 million to pay Momentum's June 2002 salaries and other expenses immediately following Closing.  On or about June 30, 2002, E*TRADE was forced to infuse another $4 million to permit Momentum to continue its operations.  In July 2002, E*TRADE was forced to contribute additional funds to Momentum.

95.     To date, E*TRADE has been forced to infuse more than $8 million into Momentum as a result of Defendants' fraud.  In addition, various third-parties, including trading groups, customers and others, have asserted millions in claims against Momentum—and are seeking to hold Momentum and E*TRADE liable for these claims—based on alleged fraudulent promises and acts by Defendants, as discussed above.

### Violations of the Merger Agreement With Respect to Restricted Stock

96.     As part of the consideration for the Merger, E*TRADE instructed its stock transfer agent to issue a certificate for 9,400,042 shares of restricted E*TRADE shares to MarketXT Holdings (the "Restricted Shares").

97.     In connection with the Merger, on or about May 31, 2002, E*TRADE and MarketXT Holdings entered into a Lock-Up Agreement regarding the Restricted Shares. Pursuant to the Lock-Up Agreement, Defendants agreed not to sell or transfer, or attempt to sell, transfer, pledge or hypothecate, the Restricted Shares for a period of two years.  In relevant part, the Lock-Up Agreement provided that Defendants would not:

directly or indirectly, during a period of two years from the Closing Date .
. . , without the prior written consent of [E*TRADE], issue, sell, offer or
agree to sell, grant any option for the sale of, pledge, make any short sale
or maintain any short position, establish or maintain a "put equivalent
position" (within the meaning of Rule 16-a-1(h) under the Exchange Act),
enter into any swap, derivative transaction or other arrangement that
transfers to another, in whole or part, any of the economic consequences
of ownership of the [Restricted Shares] (whether any such transaction is to
be settled by delivery of shares of [E*TRADE] Common Stock, other
securities, cash or other consideration) received or to be received by
[MarketXT Holdings] pursuant to the terms of the Merger Agreement or
otherwise dispose of, any shares of [E*TRADE] (or any securities
convertible into, exercisable for or exchangeable for shares of Parent
Common Stock) or interest therein of [E*TRADE or its subsidiaries] . . .

98.    The Lock-Up Agreement further provided that the Restricted Shares

would be released from the foregoing restrictions in an orderly manner. The first 30% of

the Restricted Shares would be released from the resale restrictions when a registration

statement for those shares is declared effective by the SEC.   The next 30% of the

Restricted Shares would be released on December 31, 2002, and the final 40% would be

released on December 31, 2003.

99.    In addition, the Lock-Up Agreement provided that the stock certificate for

the Restricted Shares would be restricted and bear the following legend, among other

restrictions:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE MAY
ONLY BE TRANSFERRED IN ACCORDANCE WITH THE TERMS
OF AN AGREEMENT DATED APRIL 10, 2002 BETWEEN THE
REGISTERED HOLDER HEREOF AND E*TRADE GROUP, INC., A
COPY OF WHICH AGREEMENT IS ON FILE AT E*TRADE'S
PRINCIPAL OFFICES . . .

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT
BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS
AMENDED, OR ANY STATE SECURITIES LAWS, AND MAY NOT
BE SOLD OR OTHERWISE DISPOSED OF . . .

THE SECURITIES EVIDENCED BY THIS CERTIFICATE MAY
ONLY BE TRANSFERRED IN ACCORDANCE WITH THE TERMS
OF AN ORDERLY DISTRIBUTION AND LOCK-UP AGREEMENT
DATED AS OF MAY 31, 2002 . . .

100.   In accordance with the Merger Agreement, MarketXT Holdings was not

permitted to sell more than a limited number of shares of E*TRADE stock except

through E*TRADE or a broker-dealer affiliated with E*TRADE.  In addition, E*TRADE

negotiated to obtain a right of first refusal with respect to the Restricted Shares.  For five

years after Closing, this right of first refusal granted E*TRADE the opportunity to

repurchase, at then-current market value, the Restricted Shares from MarketXT Holdings.

101.   Upon information and belief, notwithstanding these restrictions, Omar

Amanat has caused MarketXT Holdings unlawfully to pledge or otherwise to encumber

certain of the Restricted Shares to procure $5 million in credit from a MarketXT

Holdings shareholder.  Hypothecation of the Restricted Shares is in direct contravention

of the Lock-Up Agreement.  Similarly, Omar Amanat separately attempted to procure a

loan, using the Restricted shares as collateral, from another third party, Europacific Asset

Management Group.  Again, such action directly violates the Lock-Up Agreement.

102.   In addition, Ryan, with Omar Amanat's knowledge, attempted to have

MarketXT Holdings sell some or all of the Restricted Shares through Salomon Smith

Barney, Inc. ("SSB") and possibly other broker-dealers.  E*TRADE discovered this

breach of the Lock-Up Agreement when, following Closing, it was contacted by an SSB

representative inquiring whether there was a way to obtain liquidity for the Restricted

Shares.  The representative also inquired whether there was any way to hedge against the

Restricted Shares.  Upon information and belief, Ryan had not informed SSB that the

Restricted Shares were unregistered and could not be sold or otherwise encumbered

-40-

pursuant to MarketXT Holdings' agreements with E*TRADE.   On information and belief, Omar Amanat also has attempted to pledge Restricted Shares to repay debts owed by MarketXT Holdings' other subsidiary, MarketXT, again without disclosing the restrictions applicable to those shares.

103.   By this conduct, Omar Amanat repeatedly violated the Lock-Up Agreement and the Merger Agreement.

### Omar Amanat Engaged in Fraudulent Conduct Designed to Achieve the Earn-Out Targets

104.   Upon information and belief, Omar Amanat has made secret arrangements with one or more persons to induce them to conduct trading activity with Momentum that has no purpose other than to help increase Momentum's revenues and to help MarketXT Holdings achieve stated Earn-out targets in the Merger Agreement.   Upon information and belief, to encourage traders to place trades with Momentum, Omar Amanat has agreed to pay traders a multiple of any losses they may incur in transactions executed through Momentum.   As a consequence, traders have engaged in artificial trading activity for the sole purpose of enriching MarketXT Holdings, including shareholders Omar Amanat and Sharif Amanat.   This activity distorted the nature of Momentum's business as part of Omar Amanat's ongoing efforts to conceal the fraud he and others perpetrated on E*TRADE.

### Defendants' Fraud Continues with the Standstill Agreement

105.   Following Closing, E*TRADE gradually began to discover Defendants' fraudulent conduct.   As a result, E*TRADE demanded, among other things, that MarketXT Holdings remit funds to E*TRADE sufficient to cover the liabilities that Defendants hid from E*TRADE and to take other actions required by the Merger and

-41-

related agreements. After prolonged negotiations, the parties were unable to resolve all controversies. On or about September 13, 2002, Omar Amanat and MarketXT Holdings induced E*TRADE to sign a Standstill Agreement designed, in part, to permit E*TRADE to recoup at least $7 million to cover various expenses it was forced to incur as a result of Defendants' fraud. In that agreement, MarketXT Holdings agreed to sign certain documentation allowing certain E*TRADE shares that had been part of the consideration to be paid to MarketXT Holdings in the Merger to be sold and $7 million of the proceeds to be delivered to E*TRADE. Omar Amanat executed that agreement on behalf of MarketXT Holdings.

106.   Omar Amanat's subsequent actions make it clear that he never intended to perform under that agreement but was simply trying to delay E*TRADE's initiation of this litigation. Since the execution of the Standstill Agreement, Omar Amanat has refused, despite numerous demands by E*TRADE, to honor any of MarketXT Holdings' obligations under the Standstill Agreement. In particular, he and MarketXT Holdings have refused to execute the documentation necessary to enable E*TRADE to obtain the $7 million in proceeds from the sale of E*TRADE shares. Omar Amanat informed E*TRADE's representative that he (Amanat) reneged on the Standstill Agreement because there was "nothing in it" for him.

**Defendants Acted at All Times with Scienter
and Intent to Engage in Fraud**

107.   Defendants, in their efforts to induce E*TRADE to enter into the Merger Agreement and their subsequent actions designed to take advantage of their misconduct, had the motive and opportunity to defraud E*TRADE. Specifically, Defendants stood to gain concrete benefits including, but not limited to, benefits resulting from Defendants'

fraudulent and deceptive overvaluation of the Tradescape Entities, their receipt of E*TRADE securities and the ability to obtain additional compensation through the Earn-out provisions of the Merger Agreement.

108.   Defendants made their materially false and misleading statements, omitted material facts, and engaged in their deceptive conduct with knowledge of the false, misleading and deceptive character of their acts or, if they did not know, they were in reckless disregard of the truth.  Defendants knew or were reckless in not knowing that E*TRADE agreed to the Merger Agreement, as well as the Standstill Agreement, on the basis of inaccurate information derived as a result of Defendants' fraud.

109.   Defendants intended for E*TRADE to rely upon the Defendants' representations and greater knowledge concerning the Tradescape Entities when E*TRADE agreed to the Merger Agreement and the Standstill Agreement.

### E*TRADE Reasonably Relied on Defendants' Representations

110.   E*TRADE relied on Defendants' misrepresentations in agreeing to enter into the Merger Agreement and the Standstill Agreement.  Given Defendants' greater access to the relevant information concerning the Tradescape Entities, it was reasonable (and, in fact, inevitable) that E*TRADE did so.  Had Defendants disclosed the true financial condition of the Tradescape Entities, including their true assets and liabilities, E*TRADE would have insisted that the Merger be consummated on materially different terms and conditions, if at all.

111.   E*TRADE reasonably relied on Defendants' written and oral representations.  E*TRADE reasonably relied on Defendants to be fully candid and honest and were misled by the Defendants' deceptive and fraudulent conduct.

-43-

E*TRADE was unaware of the truth when it executed the Merger Agreement and the Standstill Agreement.

## COUNT 1

### (Violations of Exchange Act § 10(b) and Rule 10b-5 Thereunder)

### (Against All Defendants)

112.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 111 above as if fully set forth herein.

113.   This Count is alleged under Exchange Act Section 10(b), 15 U.S.C. § 78a, *et seq.*, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

114.   As alleged above, Defendants made materially false or misleading statements and omissions of material fact to E*TRADE to induce E*TRADE to purchase securities. These misrepresentations were made: in the Merger Agreement executed by MarketXT Holdings; in documents Defendants created and provided to E*TRADE in connection with the Merger; and otherwise to E*TRADE in connection with the Merger. Defendants engaged in a course of conduct that operated as a fraud and deceit on E*TRADE. Specifically, Defendants have:

  (a)   employed devices, schemes and artifices to defraud;

  (b)   made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and

  (c)   engaged in acts, practices and courses of conduct that operate as a fraud and deceit.

-44-

115.   Defendants had a duty to disclose to E*TRADE material information known to them because, *inter alia*, the Defendants made representations to E*TRADE that gave rise to a duty to speak completely, accurately and truthfully.   Moreover, Defendants possessed superior knowledge about the Tradescape Entities, which information was not readily available to E*TRADE.

116.   E*TRADE reasonably relied on Defendants' written and oral representations.   E*TRADE reasonably relied on Defendants to be fully candid and honest and were misled by Defendants' deceptive conduct.   E*TRADE was unaware of the truth when it agreed to the Merger.

117.   As a direct and proximate result of the Defendants' materially false or misleading statements, omitted material facts, and deceptive conduct, E*TRADE agreed to consummate the Merger on the terms and conditions specified in the Merger Agreements.   Had E*TRADE known the true financial condition of the Tradescape Entities, E*TRADE would not have agreed to the terms and conditions contemplated by the Merger Agreement.

118.   As a direct and proximate result of Defendants' violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder, E*TRADE has suffered damages.   Among other things, E*TRADE was deceived into consummating the Merger and paying an inflated price for Momentum, and has been forced to contribute millions of dollars to sustain Momentum's operations.   E*TRADE is entitled to both equitable relief and an award of compensatory damages in an amount to be determined at trial.

## COUNT II

### (Common Law Fraud and Deceit)

### (Against All Defendants)

119.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 118 above as if fully set forth herein.

120.    This Count is alleged and contains claims against all Defendants for common law fraud and deceit.

121.    The claim in this Count arises out of the same nucleus of operative facts as the Section 10(b) claim in Count I.  The claim in this Count is so related to Count I that it forms part of the same case or controversy as Count I.

122.    As alleged above, Defendants engaged in fraud and deceit in connection with the Merger Agreement and the Standstill Agreement and the transactions contemplated thereby.  They made materially false or misleading omissions of material facts to E*TRADE in order to induce E*TRADE to enter into the Merger.   These misrepresentations were made: in the Merger Agreement executed by MarketXT Holdings; in documents Defendants created and provided to E*TRADE in connection with the Merger; and in various other statements to E*TRADE in connection with the Merger.  Defendants engaged in a course of conduct that operated as a fraud and deceit on E*TRADE.

123.    Defendants had a duty to disclose to E*TRADE material information known to them because, *inter alia*, the Defendants made representations to E*TRADE that gave rise to a duty to speak completely, accurately and truthfully.   Moreover,

-46-

Defendants possessed superior knowledge about the Tradescape Entities, which information was not readily available to E*TRADE.

124.   As a direct and proximate result of Defendants' materially false or misleading statements, omitted material facts, and deceptive conduct, E*TRADE agreed to consummate the Merger on the terms and conditions specified in the Merger Agreements.  Had E*TRADE known the true financial condition of Momentum and the state of its business, E*TRADE would not have agreed to the terms and conditions contemplated by the Merger Agreement.   Moreover, E*TRADE was induced by Defendants' fraud to forgo initiation of this action and to sign a Standstill Agreement Defendants never intended to perform.

125.   As a direct and proximate result of Defendants' fraud, E*TRADE has suffered damages.  Among other things, E*TRADE was deceived into consummating the Merger, paying an inflated price for the Tradescape Entities, and has been forced to contribute millions of dollars to sustain their operations.  E*TRADE is entitled to both equitable relief and an award of compensatory damages in an amount to be determined at trial.

126.   Because the Defendants acted maliciously, willfully, wantonly and with conscious disregard of E*TRADE's interests, E*TRADE is entitled to punitive damages in an amount to be determined at trial.

**COUNT III**

**(Control Person Liability)**

**(Against All Defendants)**

127.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 126 above as if fully set forth herein.

128.    The claim in this Count arises out of the same nucleus of operative facts as those alleged regarding Counts I and II above.  The claim in this Count is so related to Counts I and II that it forms part of the same case or controversy as Counts I and II.

129.    Defendants acted as controlling persons of MarketXT Holdings within the meaning of Exchange Act Section 20(a), 15 U.S.C. § 78t, as alleged herein.  By virtue of their high-level positions, substantial stock holdings and participation in or awareness of MarketXT Holdings' operations and those of its affiliates, Defendants had the power to direct, influence and control and did direct, influence and control, directly or indirectly, the management, policies, and decision-making of MarketXT Holdings and the Tradescape Entities, including, *inter alia*, efforts to make material misrepresentations of fact and to misappropriate assets as alleged herein.  In addition, despite their knowledge thereof, Defendants failed to control or prevent MarketXT Holdings' false, misleading and deceptive acts and, in fact, directed MarketXT Holdings to engage in such acts.

130.    Defendants directed, influenced, and controlled the management, policies, and decision-making of MarketXT Holdings with knowledge of the false, misleading, and deceptive character of MarketXT Holdings' acts, and with the clear intent to defraud E*TRADE, if they did not know, they were in reckless disregard of the truth.

-48-

131.    As officers and/or directors of MarketXT Holdings, Defendants had direct involvement in or intimate knowledge of MarketXT Holdings' day-to-day operations and had the power to control or influence, and indeed did control and influence, MarketXT Holdings' actions with respect to the Merger. as alleged herein.

132.    By virtue of their positions as controlling persons of MarketXT Holdings, their knowledge of ongoing violations of the securities laws and their reckless disregard thereof, Defendants are liable as control persons pursuant to Exchange Act Section 20(a).

133.    As a direct and proximate result of Defendants' fraud, E*TRADE has suffered damages.  Among other things, E*TRADE was deceived into consummating the Merger, paying an inflated price for the Tradescape Entities, and has been forced to contribute nearly $8 million in capital to sustain its operations.  E*TRADE is entitled to both equitable relief and an award of compensatory damages in an amount to be determined at trial.

## COUNT IV

### (Tortious Interference with Contract – Merger Agreement)

### (Against All Defendants)

134.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 133 above as if fully set forth herein.

135.    The claim in this Count arises out of the same nucleus of operative facts as those alleged regarding Counts I through III, above.  The claim in this Count is so related to Counts I through III that it forms part of the same case or controversy as Counts I through III.

136.   As alleged above, Defendants caused MarketXT Holdings to enter into a contract, *i.e.*, the Merger Agreement, as amended.

137.   Omar Amanat and Ryan, by virtue of their comprehensive involvement in the Merger negotiations and their day-to-day control over the business of MarketXT Holdings and the Tradescape Entities, were fully aware of the existence and terms of the Merger Agreement.  Omar Amanat himself signed the agreement on behalf of MarketXT Holdings.  For the same reasons, Omar Amanat and Ryan were aware of additional promises by MarketXT Holdings during Merger negotiations in order to secure E*TRADE's final assent to the Merger.

138.   Pursuant to the Merger Agreement, Defendants bound MarketXT Holdings to, among other things, preserve the Tradescape Entities' relationships with those having business with them, maintain the Tradescape Entities' assets and properties in good working order and condition, and to comply in all material respect with all laws and regulations so that the Tradescape Entities' goodwill and ongoing business not be impaired.

139.   Defendants also obligated MarketXT Holdings not to take any action or engage in any practice or enter into any transaction that would cause any of the representations made in the Merger Agreement to be untrue in any respect or result in any breach of any covenant made on behalf of MarketXT Holdings.

140.   Defendants further agreed that, for two years following the Closing, they would not sell, pledge, or enter into any transaction to transfer ownership of the Restricted Shares.  The Merger Agreement also provided that E*TRADE was entitled to

a right of first refusal with respect to the E*TRADE stock provided to MarketXT Holdings in the Merger.

141. Defendants caused MarketXT Holdings to breach its contractual obligations to E*TRADE by impairing Momentum's relationships and assets; by taking multiple actions which caused the representations in the Merger Agreement to be false; and by violating the provisions of the Lock-Up Agreement with respect to the E*TRADE stock transferred as part of the Merger Agreement. Thus, Defendants tortuously interfered with the contract between E*TRADE and MarketXT.

142. By their fraudulent conduct alleged above, including, but not limited to, pilfering Momentum's assets; directing MarketXT Holdings and Momentum employees not to pay outstanding bills to vendors and others; attempting to sell restricted shares of E*TRADE shares; and engaging in a series of fraudulent accounting practices, Omar Amanat and Ryan directly, intentionally, and maliciously procured MarketXT Holdings' and Momentum's breach of the Merger Agreement. Omar Amanat and Ryan also directly, intentionally, and maliciously procured such breach by failing to honor, and by preventing MarketXT Holdings and Momentum from honoring, the additional promises made during the Merger negotiations to induce E*TRADE's assent.

143. As a direct and proximate result of Omar Amanat's and Ryan's procurement of MarketXT Holdings' breach of the Merger Agreement, E*TRADE has been damaged in an amount to be determined at trial.

144. Because Defendants acted maliciously, willfully, wantonly and with conscious and/or reckless disregard of E*TRADE's interests, E*TRADE is entitled to punitive damages in an amount to be determined at trial.

**COUNT V**

**(Tortious Interference with Contract - Standstill Agreement)**

**(Against Defendant Omar Amanat)**

145.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 144 above as if fully set forth herein.

146.    The claim in this Count arises out of the same nucleus of operative facts as those alleged regarding Counts I through IV, above.  The claim in this Count is so related to Counts I through IV that it forms part of the same case or controversy as Counts I through IV.

147.    As alleged above, MarketXT Holdings entered into a contract, *i.e.*, the Standstill Agreement.

148.    Omar Amanat, by virtue of his comprehensive involvement in the Merger negotiations and their day-to-day control over the business of MarketXT Holdings and the Tradescape Entities, was fully aware of the existence and terms of the Standstill Agreement.   Omar Amanat himself signed the agreement on behalf of MarketXT Holdings.

149.    Pursuant to the Standstill Agreement, MarketXT Holdings was obligated to, among other things, sign certain documentation allowing certain E*TRADE shares that had been part of the consideration to be paid to MarketXT Holdings in the Merger to be sold and $7 million of the proceeds to be delivered to E*TRADE.

150.    Since the execution of the agreement, MarketXT Holdings, at the direction of Omar Amanat,  has refused, despite numerous demands by E*TRADE, to honor its

-52-

obligations under the Standstill Agreement.  In particular, MarketXT Holdings, at the direction of Omar Amanat, has refused to execute the documentation necessary to enable E*TRADE to obtain the $7 million in proceeds from the sale of E*TRADE shares.  Thus, Omar Amanat has tortuously interfered with the Standstill Agreement between E*TRADE and MarketXT.

151.    As a result of the foregoing, MarketXT Holdings, at the direction of Omar Amanat, has breached the Standstill Agreement.  By reason of Omar Amanat's tortuous inducement of that breach, E*TRADE is entitled to both equitable relief and an award of compensatory damages in an amount to be determined at trial.

### COUNT VI
### (Breach of Fiduciary Duty)

### (Against All Defendants)

152.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 151 above as if fully set forth herein.

153.    The claim in this Count arises out of the same nucleus of operative facts as those alleged regarding Counts I through V, above.  The claim in this Count is so related to Counts I through V that it forms part of the same case or controversy as Counts I through V.

154.    As officers and directors of Momentum, Defendants Omar Amanat and Ryan owed fiduciary duties to Momentum and E*TRADE.

155.    By deceiving and defrauding E*TRADE in connection with the Merger, by depleting the assets of Momentum and putting Momentum in danger of violating regulatory net capital requirements, by engaging in unlawful accounting practices that

further impaired Momentum's financial condition, and by unlawfully converting assets from Momentum, Omar Amanat and Ryan breached their fiduciary duties to Momentum.

156.   As a member of MarketXT Holdings' board of directors, as well as a primary shareholder in MarketXT Holdings, and through his participation in the Merger and related conduct as discussed above, Sharif Amanat knowingly participated with Ryan and Omar Amanat, as fiduciaries, in this breach of trust to Momentum and E*TRADE.

157.   As a direct and proximate result of Defendants' breach of fiduciary duties to E*TRADE and Momentum, E*TRADE has suffered, and continues to suffer, damages, including, but not limited to, those damages relating to the unlawful conversion of Momentum funds and continuing depletion of Momentum's assets, as well as damages relating to E*TRADE's consummation of the Merger on unfavorable terms.

158.   Defendants' conduct was a substantial factor in causing E*TRADE's losses.   Among other things, absent this conduct, E*TRADE would have avoided payment of millions of dollars that it was required to infuse into Momentum as a result of Defendants' breach.   In addition, E*TRADE would have insisted on terms more reflective of Momentum's true, but concealed, financial condition.

## COUNT VII

### (Conversion)

### (Against Defendant Omar Amanat)

159.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 158 above as if fully set forth herein.

160.   The claim in this Count arises out of the same nucleus of operative facts as those alleged regarding Counts I through VI, above.   The claim in this Count is so related to Counts I through VI that it forms part of the same case or controversy as Counts I

through VI.  As alleged above, Omar Amanat took actual possession of, and exercised dominion over, certain assets belonging to E*TRADE including, but not limited to, funds that Omar Amanat converted to unlawful uses.

161.    E*TRADE had a superior right of possession to the assets of the Tradescape Entities.  By exercising unauthorized dominion over those assets to the exclusion of E*TRADE's rights, Omar Amanat damaged E*TRADE in an amount to be determined at trial.  In addition, E*TRADE is entitled to compensatory and punitive damages to be determined at trial.

## COUNT VIII

### (Unjust Enrichment)

### (Against Omar Amanat)

162.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 161 above as if fully set forth herein.

163.    The claim in this Count arises out of the same nucleus of operative facts as those alleged regarding Counts I through VII, above.  The claim in this Count is so related to Counts I through VII that it forms part of the same case or controversy as Counts I through VII.

164.    As alleged above, Omar Amanat removed assets from the Tradescape Entities just prior to Closing and converted those assets to their own use.

165.    As a result of this removal of assets from corporations owned by E*TRADE and the unlawful conversion of E*TRADE's funds, Omar Amanat has been unjustly enriched at E*TRADE's expense.

166.   Omar Amanat also failed to pay, or disclose to E*TRADE, millions of dollars in liabilities to vendors, suppliers, and others, thus impairing the value of the Tradescape Entities but failing to disclose these liabilities during negotiations regarding valuation of the Tradescape Entities.   Upon discovery of these undisclosed and unpaid liabilities, E*TRADE was forced to infuse nearly $8 million into the Tradescape Entities.

167.   As a result of this fraudulent conduct, Omar Amanat was unjustly enriched to the extent that compensation from E*TRADE pursuant to the Merger Agreement was based on Defendants' fraudulent overvaluation of the Tradescape Entities.   Omar Amanat was also unjustly enriched to the extent that E*TRADE itself paid amounts due and owing by Momentum as a result of Defendants' own pre-Merger conduct.

168.   The fraudulent conduct and conversion of funds by Omar Amanat are such that equity and good conscience require Omar Amanat to make restitution to E*TRADE.

**COUNT IX**

**(Declaratory Relief)**

**(Against All Defendants)**

169.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 168 above as if fully set forth herein.

170.   The claim in this Count arises out of the same nucleus of operative facts as those alleged regarding Counts I through VIII, above.   The claim in this Count is so related to Counts I through VIII that it forms part of the same case or controversy as Counts I through VIII.

171.   E*TRADE at all times performed such of its obligations under the Merger Agreement and Standstill Agreement as it was able to perform in view of Defendant's actions to cause MarketXT Holdings' breaches.

172.   Defendants caused MarketXT Holdings to fail to perform its obligations under the Merger Agreement and the Standstill Agreement.

173.   By reason of the Defendants' fraudulent inducement of the Merger Agreement, E*TRADE is entitled to a declaratory judgment declaring, *inter alia,* that E*TRADE is discharged and excused from any further performance under that Agreement and that all rights of Defendants to benefits under these agreements including, but not limited to, any benefits relating to or arising from the Earn-out provisions of the Merger Agreement, are null and void.

## DEMAND FOR JUDGMENT AND RELIEF

WHEREFORE, Plaintiff E*TRADE demands judgment against Defendants on each Count of the Complaint and relief as follows:

(a)   an Order that:

(i)   requires the Defendants to account for all assets they or entities they control misappropriated from E*TRADE or the Tradescape Entities;

(ii)   requires that Defendants return to E*TRADE and the Tradescape Entities all assets that Defendants, or entities they control, wrongfully misappropriated from E*TRADE;

(iii)   restrains and enjoins the Defendants from diverting or removing assets from the Tradescape Entities; and

-57-

       (iv)    declares that E*TRADE is excused from any further performance under the Merger Agreement, and that the Defendants' rights to any benefits from these agreements including, but not limited to, any benefits relating to or arising from the Merger Agreement's earn-out provisions, are null and void.

(b)    Awards E*TRADE compensatory damages from the Defendants, jointly and severally, in an amount to be determined at trial but presently believed to be not less than $20 million;

(c)    Awards E*TRADE punitive damages on its common law claims against each Defendant for their participation in wanton, willful and fraudulent misconduct in the amount of $100 million each;

(d)    Awards E*TRADE reasonable attorneys' fees; and

(e)    Grants such other and further relief as the Court deems just and proper under the circumstances.

Dated: April 9, 2004

Respectfully submitted,

Peter N. Wang (PW9216)
Friedman, Wang & Bleiberg, P.C.
90 Park Avenue
New York, New York 10016
212-682-7474

Richard J. Morvillo (RM0441)
Jeffrey F. Robertson (JR0024)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

Attorneys for Plaintiff